RANDOLPH, Justice,
for the Court:
¶ 1. Darrin D. Wilson appeals his conviction of rape, burglary, extortion, and two *723 counts of kidnapping in the Scott County Circuit Court. Finding that all of Wilson’s claims on appeal lack merit, we affirm the convictions and sentences.
FACTS AND PROCEDURAL HISTORY
¶ 2. Around 10:30 p.m. on April 14, 2010, Jessica Goodwin was at her home in Scott County with her infant daughter, Kaylee Alford. Goodwin lived with her daughter and fiancé, Brian Alford, but Brian had left for work at about 10:00 that night. As she was preparing to bathe Kaylee, Goodwin put the baby in her crib and walked to the living room to pick up something. While in the living room, Goodwin looked up and saw a person in a mask pointing a gun at her. Goodwin testified that the back door had been shut but unlocked, and that the person had come in through the back door. The person asked Goodwin for money and guns, and she told him that she didn’t have either. He put the gun to Goodwin’s head and walked with her to the bedroom, where Kaylee was in her crib. As they were walking to the bedroom, Goodwin saw a second person wearing a mask and carrying a gun walk in through the back door. Goodwin continued to insist that she had no money or guns, and the first person then pointed the gun at Kaylee and asked Goodwin if she wanted Kaylee to die. Goodwin screamed “no!” and promised that she didn’t have anything, and he stopped pointing the gun at the baby. Goodwin asked him if she could pick up Kaylee, and he allowed her to do so. He instructed Goodwin to put Kaylee on the bed, then told Goodwin to pull her pants down and lie on the bed. Around this time, the second person entered the bedroom and searched the room, ostensibly for guns and money. Goodwin testified that the first person “said that I didn’t have what he wanted, so we were coming with him.” [1] He pointed the gun at her as they walked out of the house through the back door, Goodwin carrying Kaylee.
¶ 3. After leaving the house, the first person walked Goodwin down the road about 200 yards to a driveway where a car was parked. He made Goodwin, still holding Kaylee, get in the back seat of the ear, and then he got in the driver’s seat, and the second person got in the passenger seat. They drove a short distance, and the car stopped. Goodwin saw a third person, not wearing a mask, standing outside the car. As he got into the back seat with Goodwin and Kaylee, the third person put a mask on. Goodwin testified that she was able to see his face before he put his mask on, and that she recognized him from high school as Damien Pace. They continued driving, and the third person announced that he was ready to have sex. The first person asked Goodwin about her fiancé and whether she drove a black car with rims. When she said that she did, he said that he had seen her before and that she had an attitude, and then asked her whether her vagina[2] had an attitude.
¶ 4. The first person asked Goodwin whether she could get them some money, and she told them that she could call her father, Tim Goodwin. They had taken Goodwin’s cell phone from her house, and they handed it to her and told her to call her father. She dialed the number, but no *724 one answered. She then dialed her stepbrother’s number, and he answered. Goodwin asked to speak to her father, and her stepbrother handed the phone to Goodwin’s stepmother, Angie Goodwin. Goodwin told Angie that she and Kaylee had been kidnapped, that the kidnappers wanted money, and that they had said not to call the police, or they would kill Goodwin and Kaylee. Angie was in bed with Tim and had the phone on speaker, and, as Goodwin was talking to Angie, Tim awoke, and Goodwin repeated to him what she had told Angie. Tim could not understand Goodwin, because Kaylee was crying loudly. At some point, the first person had stopped the car in a pasture. The first person told Goodwin to give Kaylee to Pace and to get out of the car. The first person had removed his mask, and, standing outside of the car in the pasture, Goodwin saw his face. As instructed, Goodwin gave Kaylee to Pace and got out of the car, and then, at the first person’s instruction, told her father that the kidnappers wanted $2,000 and would kill Goodwin and Kaylee if he called the police. Tim told the first person that he did not have $2,000, but that he had $500. The first person instructed him to put the $500 “in something” and place it at the bottom of a stop sign at the end of the road where Goodwin lived. Tim placed the $500 in a brown paper bag and left it by the stop sign.
¶ 5. The first person instructed Goodwin to get Kaylee, because Kaylee was still crying in the back seat. As Goodwin was standing and holding Kaylee in the pasture next to the car, the first person, holding the gun, penned Goodwin against the car and raped her. The second person and Pace then got out of the car, and Pace raped Goodwin. Afterward, they told Goodwin to get back in the car, and the three men also got in the car.
¶ 6. They drove away, and the first person stopped the car to let the second and third persons get out of the car. The first person drove to a driveway, stopped the car, and got out near a trailer. When he came back, he was on the phone with Goodwin’s father, and he drove the car to the stop sign to pick up the bag of money that Tim had deposited there. He then drove back to the same driveway and, still on the phone with Tim, counted the money to make sure all $500 were there. The first person got out of the car and returned shortly with the other two men. They got in the car, and the first person drove to another driveway, and the three men got out of the car. The second person opened the car door and told Goodwin that the first person was looking for something to use to clean Goodwin, so that, if she went to a hospital, no DNA would be found. The first person returned with a plastic water bottle, and instructed Goodwin to squirt the liquid into her vagina. Goodwin testified that it burned badly and smelled like Clorox. She also testified that they had taken her underwear.
¶ 7. Afterward, they all got back into the car and began driving. The first person called Tim and told him that they were going to drop Goodwin somewhere for Tim to pick her up. The first person stopped the car, told Tim where they were leaving Goodwin, let her and Kaylee out, and Goodwin ran. In a few minutes, Tim and Goodwin’s stepbrother arrived to pick her up. They drove her to her father’s house, and her stepmother then drove her to the hospital.
¶ 8. Upon Goodwin’s arrival at the hospital emergency room, she was treated by two nurses, Kim Phillips and Kelsey Abies. Goodwin told the nurses that she had been raped. The nurses completed a rape kit, with Phillips taking samples using vaginal swabs, and Abies sealing and marking *725 each sample in a designated envelope. After completing the rape kit, the nurses sealed it in an envelope and placed the sealed envelope in a refrigerator in a locked room, for law enforcement officials to collect. Sergeant Pete Lingle picked up Goodwin’s sealed rape kit from the hospital and gave it to Willie Anderson, an investigator with the Scott County Sheriffs Department. Anderson placed it in an evidence refrigerator at the Sheriffs Department. He later took it out of the refrigerator, still sealed, and took it to “Bose Bio-Lab”[3] for DNA testing.
¶ 9. At some point after his arrest, Wilson completed a consent form for DNA testing, and Anderson took samples using buccal swabs. He sealed the swabs in envelopes and sent them to “Bose Bio-Lab” for testing. Kathryn Moyse, a forensic DNA analyst at Scales Biological Laboratory, analyzed Goodwin’s rape kit and Wilson’s buccal swabs, and concluded that DNA of sperm from Goodwin’s vaginal swabs matched Wilson’s DNA from his buccal swabs.
¶ 10. On November 30, 2010, a grand jury in Scott County returned an indictment charging Wilson with one count of burglary, one count of rape, two counts of kidnapping, and one count of extortion. A jury trial followed, in which Goodwin identified Wilson as the first person in the narrative above — the man who first entered her house, kidnapped her, and raped her. She testified that she had identified his picture at the police station when police presented her with one picture of Wilson. She testified that, before seeing the picture, she “kinda remembered what he looked like and I saw — when I saw his picture, I knew it was him, and they told me his name.” On February 7, 2011, the Scott County Circuit Court convicted Wilson of all five charges. On February 10, 2011, judgment was entered and Wilson was sentenced to twenty years for burglary, twenty years each for the two kidnapping charges, thirty-five years for rape, and ten years for extortion.
¶ 11. On February 16, 2011, Wilson filed a “Motion for a New Trial or Other Relief,” asserting, among others, the arguments that the trial court had erred in failing to grant peremptory jury instructions on each of the five charges and that the trial court had erred in failing to grant a directed verdict at the conclusion of the State’s case-in-chief. The trial judge overruled the motion, and Wilson appealed to this Court.
ISSUES
¶ 12. This Court will consider:
1. Whether the trial court erred in overruling Wilson’s hearsay objection to an emergency-room nurse’s testimony that Goodwin had told her that she had been raped.
2. Whether the trial court erred in admitting into evidence a rape kit and buccal swabs, because the chain of custody had not been established.
3. Whether the trial court erred in denying Wilson’s motion for a directed verdict, request for [peremptory] instruction, and motion for a new trial as to the charge of kidnapping of an infant, because all elements of the kidnapping of the infant had not been established.
4. Whether the trial court erred in admitting Jessica Goodwin’s testimony identifying Wilson, because police preju-dicially presented Goodwin with Wilson’s photograph alone for identification, rather than having her identify his photo *726 graph from a photographic lineup of six or eight possible subjects.
DISCUSSION
I. Standards of Review
¶ 13. “We review a trial court’s admission or exclusion of evidence for abuse of discretion.” Richardson v. State, 74 So.3d 317, 329 (Miss.2011). “The motion for directed verdict ... is reviewed de novo .... ” Tillis v. State, 43 So.3d 1127, 1133 (Miss.2010).
II. The Trial Court Did Not Abuse Its Discretion in Overruling Wilson’s Hearsay Objection to Kim Phillips’s Testimony.
¶ 14. The trial court did not abuse its discretion in overruling Wilson’s hearsay objection to the testimony of Kim Phillips, an emergency-room nurse, regarding Jessica Goodwin’s statement that she had been raped. Wilson objected as follows:
Q. Okay. Did she allege that she was raped—
BY MR. COLLINS [Wilson’s counsel]: (Interposing) Your Honor, this would be hearsay testimony declaring a fact that has already been testified to the Court and is available, if this is what the State wants to develop, but this is hearsay testimony.
BY THE COURT: Overruled.
Thus, at trial, Wilson challenged Phillips’s testimony on the bases that (1) it described a fact already in the record and available to the court; and (2) it was inadmissible hearsay.
¶ 15. However, on appeal, Wilson challenges the testimony solely on the ground that it was inadmissible hearsay under Mississippi Rules of Evidence 801 and 802. Rule 801 provides that hearsay is “a statement, other than one made by the declar-ant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Miss. R. Evid. 801(c). Rule 802 provides that “[hjearsay is not admissible except as provided by law.'” Miss. R. Evid. 802 (emphasis added). We agree that Kim Phillips’s testimony regarding Goodwin’s allegation that she was raped was hearsay, because it was a statement that was not made at trial and was offered to prove the truth of the matter asserted — that Jessica Goodwin was raped. Thus, under the general rule against hearsay, the statement would be inadmissible.
¶ 16. Even so, the trial court properly overruled Wilson’s hearsay objection, because the testimony fell within an exception to the general rule against admitting hearsay evidence. Although the general rule is that hearsay is not admissible, hearsay statements are admissible when the law so provides. Miss. R. Evid. 802 (“[h]earsay is not admissible except as provided by law.”). Mississippi Rule of Evidence 803(4) provides that hearsay statements that are made for the purposes of medical diagnosis or treatment are admissible, as follows:
Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, regardless of to whom the statements are made, or when the statements are made, if the court, in its discretion, affirmatively finds that the proffered statements were made under circumstances substantially indicating their trustworthiness. For purposes of this rule, the term “medical” refers to emotional and mental health as well as physical health.
*727 Miss. R. Evid. 803(4). We have provided that:
[t]here is a two-part test for admitting hearsay statements under 803(4).... First, the declarant’s motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on ... in treatment.
Branch v. State, 998 So.2d 411, 414 (Miss.2008) (citations omitted). Goodwin’s statement to Nurse Phillips that she had been raped was consistent with the purposes of diagnosing and treating her. A patient’s statement that she has been raped is reasonably — and necessarily — relied on in discovering, diagnosing, and treating the patient.
¶ 17. Moreover, a patient’s statement to an emergency-room nurse who was treating her that she was raped is precisely the type of hearsay statement that Rule 803(4) is intended to make admissible. Such a statement informs medical personnel of the reason the patient is seeking treatment and the cause of any injuries, and is necessary to guide the diagnosis and treatment of her physical and emotional injuries. We have found similar statements admissible under Rule 803(4). See Simmons v. State, 722 So.2d 666, 671 (Miss.1998) (statements by alleged victims to an emergency-room physician describing sexual assault, including forced intercourse and penetration with a cylindrical object, were admissible).We also have found that statements describing conditions surrounding a sexual assault were admissible under the medical-diagnosis-or-treatment hearsay exception. See Branch, 998 So.2d at 415 (statement by victim identifying assaulter was admissible); Valmain v. State, 5 So.3d 1079, 1084 (Miss.2009) (statement by victim’s parent identifying her child’s assaulter was admissible); Madere v. State, 794 So.2d 200, 214 (Miss.2001) (victim’s expression of fear that her rapist was going to kill her was admissible). The testimony of an emergency-room nurse that, while the nurse was treating a patient, the patient said that she had been raped is unquestionably admissible under Rule 803(4). Accordingly, the trial court properly overruled Wilson’s hearsay objection and allowed Phillips to testify that Goodwin had told her that she had been raped.
III. The Trial Court Did Not Abuse Its Discretion in Admitting Goodwin’s Rape Kit and Wilson’s Buccal Swabs Into Evidence.
¶ 18. The trial court did not abuse its discretion in admitting Goodwin’s rape kit and Wilson’s buccal swabs into evidence. This Court has provided that:
[o]ur precedent is clear that “Mississippi law has never required a proponent of evidence to produce every handler of evidence.” In order for the defendant to show a break in the chain of custody, there must be an “indication or reasonable inference of probable tampering with the evidence or substitution of the evidence.” The defendant has the burden of proving tampering or substitution of the evidence, and “[a] mere suggestion that substitution could possibly have occurred does not meet the burden of showing probable substitution.”
Deeds v. State, 27 So.3d 1135, 1142 (Miss.2009) (citations omitted) (emphasis added). Wilson has not attempted to prove that such tampering or substitution occurred, but merely argues that the trial court erred in admitting the rape kit and buccal swabs, because “the chain of custody was broken and the gap was not explained.” During the trial testimony of forensic *728 DNA analyst Kathryn Moyse, Wilson objected as follows:
[t]he evidence developed previously by the State indicated that this package was delivered to somewhere called Bose Laboratory,[4] and as I understand it, this lady is here testifying for Scales Biological Laboratory. So the chain of custody would not be — did not exist.
Wilson’s mere suggestion that tampering or substitution was at issue, without any supporting evidence, did not satisfy the Deeds burden of proving probable tampering or substitution. Therefore, the trial judge did not abuse his discretion in overruling Wilson’s objection and admitting the rape kit and buccal swabs into evidence.
IV. Sufficient Evidence was Presented at Trial to Convict Wilson of the Kidnapping of Kaylee Alford.
¶ 19. Sufficient evidence existed for the jury to find Wilson guilty of the kidnapping of Kaylee Alford, Jessica Goodwin’s infant daughter. Wilson argues that he “made no effort to kidnap Kaylee Alford” and that, “[f]or a conviction to survive appeal, due process requires proof beyond a reasonable doubt of every fact necessary to constitute the crime charged.” The following elements of the indicted crime must have been proven for this Court to uphold Wilson’s conviction of kidnapping Kaylee:
1. Willfully, unlawfully, feloniously, and without lawful authority,
2. Wilson forcibly seized and confined Kaylee Alford.
See Miss.Code Ann. § 97-3-58 (Rev. 2006). We find that Wilson forcibly seized and confined both Kaylee Alford and Goodwin when he pointed a gun at Goodwin, informed her — while she was holding Kay-lee — that Goodwin was coming with him, and did not instruct Goodwin to leave Kay-lee behind.
¶ 20. The trial testimony reveals that Wilson did not affirmatively tell Goodwin to take Kaylee when he ordered Goodwin to go with him. However, there was sufficient evidence, considering the totality of the circumstances, to conclude that Wilson willfully used force to seize and confine both Goodwin and Kaylee: Goodwin was holding Kaylee when Wilson ordered her to leave with him, Wilson did not instruct Goodwin to leave the infant behind, and Wilson sought money from Tim Goodwin in exchange for the safe return of both Goodwin and Kaylee. During direct examination, Goodwin testified as follows:
He had the gun to my head and brought me back into my bedroom where my daughter was in her crib and he kept telling me to give me [sic] money and guns, and I kept telling him I didn’t have anything, and he made me open my closet and I offered him, you know, whatever was in the closet, and then, he pointed the gun to my daughter and asked me if I wanted her to die. (Witness crying.) And — that’s—and I screamed, “No!” and I told him I promised I didn’t have anything, and so, he took the gun away from her and I asked him if I could get her and he let me.
[[Image here]]
A. The second guy came into the room and started digging through all our drawers and stuff and he said that I *729 didn’t have what he wanted, so we were coming with him.
Q: And which one of them said this about going with them?
[[Image here]]
A. The first one.
Q: The first one. Okay. What did they make you do?
A. My daughter, all she had on was a diaper, so I just grabbed a blanket and he had the gun to me and we walked through — back down the hallway, through the kitchen, out the back door.
During cross-examination, Goodwin testified that her kidnappers had not told her to take Kaylee with her, as follows:
Q. Okay. During your response to Mr. Duncan, I understood that you were told to come on and go with us.
A. Right.
Q. Okay. Did they tell you to bring Kaylee with you?
A. No. I had her — well, he told me— when I asked him to get her out of the crib, I had her in my hands, and he said, “Well, you’re coming with me because you don’t have what I want.”
However, the kidnappers sought money from Tim Goodwin in exchange for the safe return of both Goodwin and Kaylee: they instructed Goodwin to call her father and stepmother and “to tell them that no cops or that he’d kill me and my daughter [,]” and, as instructed, Goodwin “told him [Tim] that they wanted two thousand dollars and he’d better not call the cops, or they’d kill us.” We find that there was sufficient evidence for the jury to find that Wilson willfully used force to seize and confine Kaylee Alford, because he instructed her mother to come with him at gunpoint while her mother was holding her and sought money in exchange for the safe return of both Goodwin and Kaylee.
¶21. We conclude that the trial court did not abuse its discretion in denying Wilson’s request for a perfunctory instruction to return a verdict of not guilty as to the charge of kidnapping Kaylee Alford or in denying Wilson’s motion for a new trial as to that charge. We likewise find that the verdict of “guilty” of kidnapping of Kaylee Alford was neither against the overwhelming weight of the evidence nor contrary to law, and, therefore, that the trial court properly denied Wilson’s motion for a directed verdict.
V. Wilson Waived His Objection to Goodwin’s Identification Testimony by Failing to Contemporaneously Object.
¶ 22. Goodwin testified that her identification of Wilson at trial was based on her recollection of him from the night of the crimes, not on the photograph she was shown at the police station. Before showing Goodwin the photograph of Wilson, police officers had her look at pictures in a high school yearbook to attempt to identify her kidnappers, and she identified Damien Pace from his yearbook picture. The officers then showed her the photograph of Wilson, after Wilson already had confessed to having raped her. Wilson called 911 on the afternoon of April 15, 2010, the day after the kidnapping and rape, and confessed as follows:
Caller: the Police come over here talking about the man done raped some white — -he ain’t did nothing, man. He was with his girlfriend.
Operator: Okay. Well, you done it?
Caller: Yeah, I did it.
The 911 dispatcher, Rhonda Weathersby, was a cousin of Wilson’s and testified at trial that she had recognized his voice on the phone before he identified himself as Darrin Wilson. A sheriffs department investigator testified that he had known Wil *730 son for twelve to fourteen years and that he also had recognized Wilson’s voice on the 911 call. A recording and transcript of the 911 call were admitted into evidence, and the recording was played for the jury.
¶ 23. Wilson argues that Goodwin’s testimony was inadmissible because police officers had suggestively presented her with a single photograph of Wilson rather than a photographic lineup of multiple individuals. However, Wilson did not object at trial when Goodwin identified him as her assailant and testified that police had presented her with a single photo and, after she had affirmed that the man in the photograph had attacked and raped her, told her that the man’s name was Darrin Wilson. We have been clear in providing that “[cjounsel must object contemporaneously to inadmissible evidence in order to preserve the error for appeal.” Boyd v. State, 977 So.2d 329, 337 (Miss.2008) (citations omitted). We have specifically provided that:
[w]hen there is no attempt to suppress the in-court identification by a pre-trial motion, and no contemporaneous objection is offered to the in-court identification, the issue is not preserved for appellate review except as an attack on the sufficiency of the evidence.
Brown v. State, 829 So.2d 93, 102 (Miss.2002). Further, we recognize that:
[preservation serves important purposes. A timely and specific objection alerts the trial court and the adversary to the alleged error, giving both an opportunity to correct the problem or take ameliorative action, thus potentially obviating the need to raise the issue on appeal. It thus encourages truth-seeking, the efficient resolution of the case, and the conservation of appellate resources. Preservation also discourages gamesmanship by preventing a party from saving a “trump card” argument until appeal.
Larry Cunningham, Appellate Review of Unpreserved Questions in Criminal Cases: An Attempt to Define the “Interest of Justice, ” 11 Journal of Appellate Practice and Process 285-86 (Fall 2010). As Wilson’s counsel did not make a timely and specific objection during trial when Jessica Goodwin identified Wilson as the man who had burglarized her home and raped and kidnapped her, the only permissible ground for this claim is as a challenge to the sufficiency of the evidence. See Brown, 829 So.2d at 102. Wilson does not challenge the photograph procedure to attack the sufficiency of the evidence, but solely claims that “[s]uch a procedure is prejudicial because it suggests that the person in the photograph is the miscreant.” Accordingly, Wilson waived this claim by not objecting at trial.
CONCLUSION
¶ 24. We conclude that the trial court did not abuse its discretion by overruling Wilson’s hearsay objection to Nurse Phillips’s testimony; by admitting Goodwin’s rape kit and Wilson’s buccal swab, over Wilson’s objection that the prosecution had not established a chain of custody; by denying Wilson’s motion for a directed verdict, request for perfunctory jury instruction, and motion for a new trial as to the charge of kidnapping Kaylee Alford; or by allowing Goodwin’s identification testimony in the absence of a contemporaneous objection. Accordingly, we affirm the jury verdict finding Wilson guilty of rape, two counts of kidnapping, burglary, and extortion and the sentences imposed by the Scott County Circuit Court.
¶ 25. COUNT I: CONVICTION OF BURGLARY OF A DWELLING HOUSE AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF *731 CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF KIDNAPPING AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF KIDNAPPING AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT IV: CONVICTION OF RAPE AND SENTENCE OF THIRTY-FIVE (35) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT V: CONVICTION OF EXTORTION AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNT V SHALL RUN CONSECUTIVELY TO THE SENTENCES IN COUNTS I, II, III AND IV, FOR A TOTAL OF ONE HUNDRED AND FIVE (105) YEARS TO SERVE, WITH CONDITIONS. APPELLANT IS TO BE GIVEN CREDIT FOR JAIL TIME SERVED.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR.

. During direct examination, Goodwin used the word "we,” but on cross examination, she testified that the men had not told her to take Kaylee with her, but that: "I had her — well, he told me — when I asked him to get her out of the crib, I had her in my hands, and he said, ‘Well, you're coming with me because you don't have what I want.’ "

. Goodwin used the word "vagina” during her testimony, but testified that her kidnapper had used "the ‘P’ word.”

. The lab that analyzed the vaginal swabs and Wilson’s buccal swabs was Scales Biological Laboratoiy. The owner of the laboratory is Dr. Bo Scales.

. The trial record suggests that the witnesses who testified that the rape kit and buccal swabs were sent to "Bose Laboratory” were not referring to a different laboratory, but to Scales Biological Laboratory itself. Moyse testified that the owners of Scales Biological
Laboratory were Bo and Barbara Scales. Thus, where the transcript reads “Bose Laboratory,” the witnesses’ meaning was likely the identically-sounding "Bo's Laboratory,” referring to Scales Biological Laboratory, owned by Bo and Barbara Scales.