# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CP-01367-COA

**RODNEY MAURICE WILLIAMS**                                                                                     **APPELLANT**

**v.**

**COURTNEY DARLENE WILLIAMS**                                                                                   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/22/2014 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | RODNEY MAURICE WILLIAMS (PRO SE) |
| ATTORNEY FOR APPELLEE: | JOHN STANNARD FARESE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | GRANTED APPELLEE A DIVORCE ON THE GROUND OF HABITUAL CRUEL AND INHUMAN TREATMENT, DISTRIBUTED THE MARITAL ESTATE, AND AWARDED APPELLEE ATTORNEY'S FEES |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART – 11/17/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**IRVING, P.J., FOR THE COURT:**

¶1.     Rodney Williams, proceeding pro se, appeals from the judgment of the Chancery Court of DeSoto County that granted his wife, Courtney, a divorce on the ground of habitual cruel and inhuman treatment. He asserts that the chancellor erred in (1) excluding certain evidence, (2) granting the divorce, (3) failing to classify certain debts, (4) distributing the marital estate, (5) awarding Courtney periodic alimony, and (6) awarding Courtney attorney's

fees. He also argues that the chancellor was biased and should have recused himself.

¶2.     We find that the chancellor did not err in excluding the evidence complained of and that the granting of the divorce and the award of attorney's fees to Courtney were proper. We further find that the record does not establish bias on the part of the chancellor. Consequently, we affirm on these issues. However, because we find that the chancellor erred in failing to classify certain debts that allegedly were incurred during the course of the marriage, we reverse and remand on this issue, which necessarily requires new consideration of the distribution of the marital estate. Also, we pretermit discussion of the issue of alimony, as it is not ripe for consideration until after the marital estate has been properly identified, valuated, and distributed.

FACTS

¶3.     Rodney and Courtney were married on November 29, 2002, in Tennessee, and they separated on or about June 30, 2013, in DeSoto County, Mississippi. No children were born to the marriage.

¶4.     On two occasions before this litigation ensued, Courtney sought to have Rodney involuntarily committed to a mental-health facility based upon allegations that Rodney was delusional and suffering from paranoia. As a result, Rodney was committed for inpatient treatment and later—following Courtney's second application to have him committed—was ordered to get outpatient treatment. After Rodney completed his outpatient treatment, he filed a complaint for divorce against Courtney, alleging habitual cruel and inhuman treatment and, in the alternative, irreconcilable differences. Courtney filed a counterclaim for divorce,

2

alleging habitual cruel and inhuman treatment, insanity, and, in the alternative, irreconcilable differences. After a trial, the chancellor dismissed Rodney's complaint and granted Courtney a divorce on the ground of habitual cruel and inhuman treatment. This appeal followed.

DISCUSSION

¶5.     The standard of review in domestic-relations matters is well-settled:

> The findings of a chancellor will not be disturbed when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong [or] clearly erroneous or an erroneous legal standard was applied. Under the standard of review utilized to review a [chancellor's] findings of fact, particularly in the areas of divorce, alimony[,] and child support, an appellate court will not [reverse] unless [the chancellor's] findings were manifestly wrong. For questions of law, our standard of review is de novo.

*Arrington v. Arrington*, 80 So. 3d 160, 164 (¶11) (Miss. Ct. App. 2012) (internal citations and quotation marks omitted).

   *I.     Exclusion of Evidence*

¶6.     Rodney argues that the chancellor erred in finding that certain letters constituted inadmissible hearsay. He contends that the letters were admissible under Rule 803(4) of the Mississippi Rules of Evidence. As might be expected, Courtney argues that the letters were properly excluded.

¶7.     During trial, Rodney attempted to submit two letters into evidence: one allegedly from a psychiatrist who had treated him during and following his outpatient treatment and one purportedly from a therapist who also had treated Rodney. Neither the psychiatrist nor the therapist was present during trial, and as noted, the chancellor found that the letters were inadmissable hearsay.

3

¶8.    "This Court reviews a trial judge's decision to admit or deny evidence under an abuse-of-discretion standard." *Wright v. Royal Carpet Servs*., 29 So. 3d 109, 113 (¶9) (Miss. Ct. App. 2010) (citation omitted). Rule 803(4) provides: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The Mississippi Supreme Court has outlined a two-part test for admitting hearsay statements under Rule 803(4): "First, the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on in treatment." *Wilson v. State*, 96 So. 3d 721, 727 (¶16) (Miss. 2012) (citation omitted).

¶9.    The first letter stated, in relevant part:

To Whom It May Concern[:]

Rodney Williams initially came under my psychiatric care while admitted to Parkwood Behavioral Health from April 8, 2013[,] to April 17, 2013.

Since then, I have followed him on an outpatient basis. He has been in my office on May 11, 2013, August 17, 2013, November 9, 2013[,] and January 11, 2014.

Over the course of his treatment[, he] has not been prescribed any medications nor has he evidenced any psychotic symptoms.

Mr. Williams'[s] current diagnosis is Depressive Disorder - Not Otherwise Specified.

¶10.   The second letter stated, in relevant part:

To Whom It May Concern:

Rodney Williams has been seeing me in individual therapy every two weeks since he saw me for his initial assessment on April 29, 2013. He has been compliant with my suggestions and in attending the therapy sessions. He has been attending Alcoholics Anonymous (AA) and Al Anon meetings weekly. He relates having started the steps with his sponsor.

In the eight months that I have seen Mr. Williams[,] I have not witnessed any behaviors that would evidence psychosis.

¶11. It is obvious that the letters were prepared for this litigation and are not statements made for the purpose of medical diagnosis or treatment, such that they would be excepted from the hearsay rule. This issue is without merit.

*II. Divorce*

¶12. Rodney contends that the chancellor erred in granting Courtney a divorce on the grounds of habitual cruel and inhuman treatment and mental illness because the evidence was insufficient to support either ground. Rodney also contends that the chancellor abused his discretion in basing his findings on certain involuntary-commitment files, which he argues were not credible evidence because they were not properly submitted to the court under Mississippi Code Annotated section 41-21-69 (Rev. 2013). He further contends that the evidence was insufficient to support the divorce because an insane person is incapable of the deliberate conduct required by Mississippi law to prove cruelty. Also, Rodney insists that the evidence failed to establish that he was ever a physical danger to Courtney. Of course, Courtney sees things differently, as she argues that the chancellor did not err in granting the divorce. Because the chancellor granted the divorce on the ground of habitual cruel and inhuman treatment, we do not discuss Rodney's insanity argument.

5

¶13. As stated, Courtney sought to have Rodney committed on two occasions. During trial, Rodney submitted the medical records that derived from the commitment proceedings in an attempt to establish that they constituted the cruel and inhuman treatment of him by Courtney. The commitment records contain two affidavits from Courtney, one in support of each application that she made to have Rodney committed. In the first affidavit, dated December 19, 2011, Courtney alleged that Rodney was "paranoid and delusional." In this affidavit, she provided details as to several incidents evidencing Rodney's paranoia and delusional state. We summarize those details as follows:

1. Rodney had been carrying a loaded pistol in his waistband, and he believed that the government was listening to everything that he said;

2. He had purchased a new engagement ring and had told Courtney that their marriage was not legal;

3. He had told Courtney that he was aware that she had signed secret papers with the government;

4. He believed that God had told him that he would be the next President of the United States and that Courtney would have to quit her job to support his campaign;

5. He believed that Michelle Obama had made comments directed toward him during a presidential debate;

6. He believed that their preacher was conspiring with a noted televangelist because he did not like Rodney's taste in music;

7. He believed that Courtney was having an affair with her ex-husband, whom she had not seen in twenty years; and

8. He suspected that he was being photographed as he completed his daily tasks.

In the affidavit, Courtney stated that she believed Rodney had been smoking marijuana

6

habitually, that she was afraid to return to the marital home, and that she feared Rodney would "harm himself or someone else if he [did] not get inpatient treatment."

¶14. On December 21, 2011, Catherine Davis with the Department of Mental Health completed a preevaluation-screening form for Rodney. In that form, she noted that he suffered from psychotic-like behavior, including delusions, irritability, and poor judgment. Catherine also noted that "Rodney is a danger to himself due to his paranoid behavior. He believes others are out to get him and are watching him. Rodney carries a loaded gun. . . . Rodney is in need of inpatient treatment due to his current psychotic behavior."

¶15. On December 28, 2011, Dr. David A. Ball evaluated Rodney and completed a form labeled "Certificate of Examining Physician/Psychologist." In the form, Dr. Ball noted that Rodney exemplified "grossly disturbed behavior/faulty perspective." Dr. Ball stated that the reason for his opinion was that Rodney "has unrealistic ideas[, such as] running for president. He has distrust for people around him[.]" Also on December 28, 2011, Dr. Lee Linder completed a certificate, in which he noted that Rodney exemplified "grossly disturbed behavior/faulty perspective." Dr. Linder also noted that Rodney posed a substantial likelihood of physical harm to himself and to others and that he should be committed to a treatment facility. On December 29, 2011, the chancery court ordered Rodney to obtain mental-health treatment through the Lakeside Behavioral Health Hospital (LBHH) in Memphis, Tennessee.

¶16. In Courtney's second affidavit, dated April 5, 2013, in support of her second attempt to have Rodney involuntarily committed, she alleged that Rodney had a history of mental

7

illness and that he had been diagnosed with paranoid schizophrenia, for which he had been prescribed psychiatric medications. Courtney also alleged that Rodney had refused to take his medications and follow up with his outpatient treatment at LBHH. Courtney further alleged that Rodney was paranoid and delusional, insomniac, and easily angered without provocation. She stated that she believed that Rodney was a danger to himself and to others. In a preevaluation-screening form dated April 8, 2013, Catherine noted that Rodney "has some psychotic symptoms," and she recommended outpatient commitment. In that same form, Catherine also noted that Rodney had been prescribed three medications to treat his condition.

¶17. In a certificate of examination, dated April 17, 2013, Doctors Dan Boyd and Tejinder Saini noted that Rodney did not pose a substantial likelihood of physical harm to himself or to others and that commitment to a treatment facility was not recommended. However, the doctors recommended outpatient treatment. The chancery court immediately ordered Rodney to complete outpatient treatment at Region IV Mental Health of DeSoto County.

¶18. During trial, the following colloquy occurred during Courtney's testimony:

> Q: [When Rodney] came home [after his first commitment,] [d]id the behavior continue?
>
> A: Not when he first got home.
>
> Q: Okay.
>
> A: But then when he stopped taking the medication, it gradually got back into chaos.
>
> Q: Okay. And at that point later on as has already been talked about in 2013, did you do the same things with this set of papers [(indicating the

8

statements made by Courtney in the second involuntary-commitment affidavit)] where there's the same thing? . . .

A:   Yes, sir.

Q:   And do you remember those lists of circumstances that are in that document?

A:   Yes, sir.

****

Q:   Did these -- did this behavior, some of which is the same, but some a little different, scare you and cause you fear?

A:   Yes, sir.

Q:   Were you scared to be with Mr. Williams --

A:   Yes, sir[.]

Q:   -- at all, much less as husband and wife?

A:   Yes, sir[.]

Q:   Did this behavior and this series of incidences make it -- do you feel like it's impossible to continue to be married to Mr. Williams?

A:   Yes, sir, as long as he wasn't taking his medicine.

¶19.   In his bench ruling, the chancellor stated:

In this case[,] looking at the evidence fairly[,] . . . the [c]ourt finds that the actions of [Rodney] because of his illness illustrated in the [commitment] files[,] which he admitted into evidence[,] reflect and corroborate the testimony of [Courtney]. [The court finds t]hat he acted at times erratically and incoherently[,] causing the marriage to break down and result[ing] in the final separation of the parties. [Rodney's behavior] was the causal effect of the separation of the parties.

Accordingly, the [c]ourt finds that . . . [Courtney] has met the burden of proof in order to be awarded a divorce on the grounds of habitual cruel and inhuman

9

treatment.

¶20. To prove cruelty, Courtney was required to show conduct on Rodney's behalf that (1) endangered her life, limb, or health or created a reasonable apprehension of such danger, rendering the marriage unsafe for her, or (2) was so unnatural and infamous as to make the marriage revolting to her and render it impossible for her to discharge the duties of the marriage, thus destroying the basis for its continuance. *Harmon v. Harmon*, 141 So. 3d 37, 41 (¶14) (Miss. Ct. App. 2014) (citations omitted). It is established that a party's "combined acts [may] manifest a course of revolting conduct [that] give[s] rise to cruelty." *Jackson v. Jackson*, 922 So. 2d 53, 57 (¶8) (Miss. Ct. App. 2006) (citation omitted).

¶21. Here, Courtney testified that when Rodney stopped taking his prescribed medications, he acted chaotically and that his behavior caused her fear. She also testified that she was afraid of Rodney and that she felt that it was impossible for her to remain married to him as long as he failed to take his medicines regularly. Courtney's testimony was supported by the commitment files, which establish that Rodney required treatment for a mental illness that, when left untreated, rendered it impossible for her to discharge the duties of the marriage. Therefore, based on our limited standard of review, we do not find that the chancellor erred in granting Courtney a divorce on the ground of habitual cruel and inhuman treatment. This issue is without merit.

¶22. As to Rodney's argument that the chancellor erred under section 41-21-69 in relying on his medical records, we first note that Rodney—not Courtney—willingly submitted those records to the chancellor for review. We also note that Rodney failed to raise this issue

10

before the chancellor. Therefore, it has been waived. *See generally Haggerty v. Foster*, 838 So. 2d 948, 954 (¶8) (Miss. Ct. App. 2002) (citation omitted).

III.    *Equitable Distribution*

A.    *Valuation of 401(k) Accounts*

¶23.    Rodney argues that the chancellor erred in valuating his retirement account based on its value at the time of trial as opposed to its value on November 13, 2013, when, according to Rodney,[1] a temporary-relief order was filed. Rodney contends that any funds placed into the retirement account after that date are his separate property. Rodney also argues that the chancellor erred in failing to classify Courtney's two retirement accounts as marital property and in failing to award him one-half of the value of those accounts.

¶24.    During trial, the following colloquy took place after Courtney's attorney questioned Rodney about the value of his 401(k) account:

> THE COURT:    Mr. Williams, . . . [y]our testimony, as I understand it, is you have no idea what your 401(k) is; is that correct?
>
> [RODNEY]:    I had a document that said it was [approximately] [$]60,[000,] and that's the last I saw it, Your Honor.
>
> THE COURT:    So what do you think it is [now]?
>
> [RODNEY]:    I'm thinking it's probably about [$]62[-]64,[000].
>
> ****
>
> [ATTORNEY]:    Do you know how much is in your 401(k)?
>
> [RODNEY]:    At the time I provided you the document, it was [approximately $]50[,000]. That was over a year or so ago. Estimate, [$]64,[000].

---

[1] The record does not reveal that a temporary order was filed on November 13, 2013.

¶25. The chancellor valued the 401(k) at $64,000, which, as discussed, was the value Rodney assigned to it on the date of trial. "When equitably dividing marital property upon divorce, the date of valuation is necessarily within the discretion of the chancellor." *Bullock v. Bullock*, 733 So. 2d 292, 298-99 (¶37) (Miss. Ct. App. 1998) (citation omitted). As such, we do not find that the chancellor abused his discretion in valuing the 401(k) as of the date of trial. This issue is without merit.

¶26. As to Rodney's claim that the chancellor erred in failing to classify Courtney's two retirement accounts as marital property and in failing to award him one-half of the value of those accounts, we note Courtney's testimony that the first account was from her employment that ended before the marriage. The chancellor failed to classify the first account as separate or marital property, but he awarded Rodney one-half of the value of the second account. We find substantial evidence supporting the chancellor's division of the second account. However, we find that the chancellor erred in failing to classify the first account because "[i]n dividing property of a couple upon divorce, the chancellor must first classify their assets and liabilities as marital or non-marital[.]" *Barnett v. Barnett*, 908 So. 2d 833, 838 (¶9) (Miss. Ct. App. 2005) (citation omitted). While it seems clear that if Courtney's testimony on this point is accepted as true, the first retirement account would likely be her separate property. However, on remand, the chancellor should make the proper classification and valuation of this account, as it should be considered in the overall distribution of the marital estate and in the determination as to the appropriateness of alimony.

### B. Valuations of Martial Residence and Memphis Property

¶27. Rodney insists that the chancellor erred in accepting Courtney's valuations of the marital residence and certain rental property, without ordering appraisals of those properties. In the alternative, he insists that the chancellor should have averaged Courtney's proposed valuations and his proposed valuations and accepted those averages as the values of the respective properties.

¶28. During trial, Rodney testified that before the marriage, he purchased a house in Memphis for $107,000 and that he had recently made some improvements to that house. However, he denied that the house had appreciated in value, and in both of his financial disclosures,[2] he valued the house at $85,000. Courtney testified that the house was valued at $107,000.

¶29. Rodney also testified that shortly after the marriage, he purchased a house in Olive Branch, Mississippi. His testimony regarding the value of that house was ambiguous, but one of his financial-disclosure statements reveals that the house was valued at $247,000. During trial, Rodney testified that he owed $226,215.40 on the house. During Courtney's testimony, she confirmed, in response to questioning, that she believed $250,000 was a fair value for the marital residence.

¶30. Neither party submitted appraisals for the houses. Also, Rodney did not object to Courtney's testimony as to the value of the marital residence. The chancellor found that the Memphis house was Rodney's separate property, and the court did not assign a value to that property. The chancellor also found that the marital residence was marital property valued

[2] The appellate record reveals that Rodney filed at least two different financial-disclosure statements: one dated November 13, 2013, and one dated July 21, 2014.

at $250,000.

¶31.    In *Jenkins v. Jenkins*, 67 So. 3d 5, 13 (¶19) (Miss. Ct. App. 2011) (internal citations and quotation marks omitted), we stated:

> While we note that expert testimony may be essential to establish valuation sufficient to equitably divide property, particularly when the assets are diverse, we also recognize and reiterate the principle that findings on valuation do not require expert testimony and may be accomplished by adopting the values cited in the parties' 8.05[3] financial disclosures, in the testimony, or in other evidence.

Here, there was substantial evidence to support the chancellor's valuation of the marital residence.  So we do not find that the chancellor abused his discretion. This issue is without merit.

### C.    Courtney's Contribution to the Acquisition of Marital Assets

¶32.    Rodney contends that the chancellor erred in finding that he and Courtney had contributed equally to the marital estate because, according to him, Courtney only made "meager material economic contribution[s] to the acquisition of the marital assets." He also contends that the chancellor erred in determining that Courtney was a homemaker.  In response, Courtney argues that she contributed to the accumulation of the marital assets as "both a financial contributor and a domestic contributor."

¶33.    During trial, Courtney testified that for eleven years out of the twelve-year marriage, she was employed by Collierville Medical Specialists in Memphis, where she earned approximately $2,400 per month in gross income.  She also testified that her grandchildren, Jamie and Shakyla, had lived with her and Rodney for a period of time.  She stated that

---

[3] UCCR 8.05.

14

"Jamie and Shalyla [had lived with them for approximately two years], but Jamie was there for longer."

¶34. The chancellor found that

> the wife was the homemaker of the parties[ and] that the husband earned the majority of the financial income. This is reflected by the domestic services rendered by [the wife] shown during the periods of time in which the grandchildren lived in the home, and she, as well as the husband, took care of them. I find that both have contributed equally toward the acquisition of property[—]he directly financial[] and she through domestic and in-kind services. Accordingly, I find that both are entitled to an equal distribution of those properties.

¶35. In *Lowrey v. Lowrey*, 25 So. 3d 274, 287 (¶31) (Miss. 2009) (citation omitted), the Mississippi Supreme Court explained:

> [T]he concept of homemaker services rests on a showing that the homemaker has contributed to the economic well-being of the family unit through the performance of the myriad of household and child-rearing tasks. In valuing this service[,] consideration should be given to the quality of the services. For example, a homemaker who, over the course of the marriage, has been frugal in the handling of homemaker expenditures and has thereby enhanced the family assets is entitled to a more equitable return than one who has been extravagant.

¶36. In this case, the record does not establish the extent of Courtney's contribution toward the acquisition of the marital property. It appears that the chancellor mistakenly thought Courtney was a stay-home spouse and grandmother. As noted, Courtney worked during the course of the marriage, working eleven of the twelve years of marriage at one place, where her net income was approximately $1,600 per month. The record does not inform us where Courtney worked during the first year of the marriage or how much she earned during that

15

year. The parties had no children together,[4] and there is no testimony in the record regarding the division of the household duties. Although Courtney took care of the grandchildren in the home for some period of time, we note that the grandchildren were her grandchildren, but not Rodney's grandchildren. It appears that the chancellor placed some weight on this fact in determining that Courtney was a homemaker and that her grandchild-caring duties contributed to the acquisition of the marital estate. The record reflects that Rodney paid the majority of the household expenses and the entire mortgage note on the marital home. It further reflects that Courtney deposited only $250 biweekly in a joint bank account to help with the household expenses but routinely withdrew money from that account for other purposes unrelated to household expenses. And the record is silent as to any other financial contributions that Courtney may have made during the marriage. Therefore, there is not substantial evidence in the record supporting the chancellor's finding that the parties "both have contributed equally toward the acquisition of property[—]he directly financial[] and she through domestic and in-kind services."

### D. Marital Debts

¶37. Rodney argues that the chancellor erred in distributing all of the marital debt to him. Alternatively, he argues that the chancellor erred in failing to classify as marital the debts listed in his financial-disclosure statement. Again, Courtney argues that no error occurred in this regard.

¶38. The chancellor found that the Olive Branch home was marital property and ordered

---

[4] Courtney was thirty-nine and Rodney was forty years old when they got married.

Robert to pay Courtney one-half of the equity in the home, and Courtney was ordered to deed the house to Robert via a quitclaim deed, leaving Robert responsible for one hundred percent of the remaining debt owed on the home. Robert was also awarded an Acura MDX, for which he still owed a debt. In his financial-disclosures statements, Robert listed several other debts that he alleged were martial, but the chancellor failed to classify or name the party responsible for paying them.

¶39. As noted, the first step in the equitable-distribution process requires chancellors to classify the parties' assets as martial or separate property. *Clausell v. Clausell,* 116 So. 3d 189, 192 (¶9) (Miss. Ct. App. 2013) (citation omitted). This includes the parties' debts. *See generally Seale v. Seale*, 150 So. 3d 987, 989 (¶7) (Miss. Ct. App. 2014) (citations omitted). The chancellor erred in failing to classify the debts set forth in Rodney's financial-disclosures statement and in failing to assign responsibility to one or both of the parties for paying the debts. Therefore, we reverse and remand on this issue.

### IV. Attorney's Fees

¶40. Rodney argues that the chancellor erred in awarding Courtney attorney's fees because there was insufficient evidence of the amount owed and of her inability to pay them. Rodney also argues that he should not have been required to pay the attorney's fees incurred by Courtney as a result of her filing frivolous motions and pleadings.

¶41. During trial, Courtney testified that her net monthly income was approximately $1,600. She confirmed that she was unable to pay her attorney's fees and that she had borrowed money from her friends and family members to pay her attorney's retainer fee. She

17

also confirmed that she was financially incapable of repaying the money that she had borrowed.

¶42. "An award of attorney's fees is appropriate in a divorce case where the requesting party establishes an inability to pay." *Stewart v. Stewart*, 2 So. 3d 770, 776 (¶18) (Miss. Ct. App. 2009) (quoting *Gray v. Gray*, 745 So. 2d 234, 239 (¶26) (Miss. 1999)). "However, if a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." *Id.* (citation and quotation marks omitted). "As the issue of whether to award attorney's fees in a divorce case is a discretionary matter left to the chancellor, this Court is reluctant to disturb such a finding." *Id.* (citation and quotation marks omitted). Here, there was substantial evidence establishing Courtney's inability to pay her attorney's fees. As such, this issue is without merit.

### V. Chancellor's Bias

¶43. Rodney alleges that the chancellor was biased against him and should have recused himself. As support for this issue, Rodney essentially points to the following rulings of the chancellor that he deems are questionable:

1. Dismissing Rodney's case without allowing relevant evidence in the trial[, including] [t]he doctor's statement, [b]ank records, work evaluations[,] and [a] marriage certificate/license[;]

2. Awarding Courtney a divorce based on [h]abitual . . . [c]ruel [and inhuman] treatment[;]

3. Allowing a "coin" to be flipped to resolve a healthcare issue[;]

4. Not addressing the erroneous healthcare clause brought before the court[;]

18

5.      Allowing the marital assets to be equally divided[,] while ignoring the marital debt and abuse of funds[;]

6.      Allowing Courtney to keep $732.51 of her primary retirement. Rodney was due $366.25 of that amount per the court's ruling[;]

7.      Allowing Courtney to keep the additional retirement account of $1,129.08 and not classifying it as marital or non-marital property[;]

8.      Allowing Courtney's opinion to stand as evidence for a $250,000[] value placed on the primary home and $107,000[] for the value of the rental property[;]

9.      Giving Courtney $12,000[] worth of equity in [thirty] days based on her . . . valuation of the marital home at $250,000[,] which[,] according to the [tax] assessor's office[, has an approximate value] of $237,966[;]

10.      Classifying Courtney as a homemaker[,] while both parties worked full[-]time jobs[,] and by [not] addressing the waste [of] marital assets[;]

11.      Awarding Courtney all of her attorney['s] fees of $10,476[,] . . . to be paid by Rodney [within thirty] days . . . [; and]

12.      Awarding [Courtney] $500[] in alimony until she dies, [marries], or other order of court when she suffered no deficit.

¶44. "For the purposes of recusal, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Mingo v. State*, 944 So. 2d 18, 31 (¶45) (Miss. 2006). As in *Mingo*, "[t]he record contains no indication that the trial judge was unreceptive or dismissive of [Rodney's] arguments. We will not find adverse rulings to demonstrate bias simply because they are adverse." *Id.* at (¶46). This issue is without merit.

¶45. **THE JUDGMENT OF THE CHANCERY COURT OF DESOTO COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEE.**

**LEE, C.J., CARLTON, MAXWELL AND JAMES, JJ., CONCUR. FAIR, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY GRIFFIS, P.J., BARNES, ISHEE AND WILSON, JJ.**

**FAIR, J., DISSENTING:**

¶46.    At trial, Courtney alleged she was entitled to a divorce because she felt it was not "safe" to live with Rodney anymore. Her proof offered for the divorce was incredibly cursory, and her testimony on this point consisted entirely of her attorney asking her whether she felt unsafe, and her answering in the affirmative. She also agreed, in another one-word answer, that the allegations she had previously made in her attempts to get Rodney committed were true. But at no point did she allege that Rodney hurt her or threatened her. Apparently Courtney intended to rely on insinuations that Rodney's mental illness made him dangerous.

¶47.    The trial judge does not seem to have accepted Courtney's claims that Rodney was dangerous, except to the extent that he found that Rodney "acted at times erratically and incoherently[,] causing the marriage to break down." I agree that the record supports that finding, but I must dissent because occasional erratic or incoherent behavior is not grounds for divorce.

¶48.    The majority fairly relays Courtney's allegations against Rodney in the commitment proceedings, though I should point out that they are a series of anecdotes collected over several years rather than descriptions of continuing behavior. And Courtney backtracked from the most important allegation on cross-examination. The first time she attempted to have Rodney committed, Courtney alleged various erratic but harmless statements Rodney

20

had made, but she topped it off with the claim that he had been carrying a loaded gun in his waistband. Her affidavit implied that this was regular and continuing behavior, but on cross-examination at trial she admitted it had only happened twice. In both instances Rodney was inside his own home, and he was armed because he feared a stranger may have come into the house. Courtney even admitted she did not know whether Rodney had real cause to be alarmed in either instance; in fact, one of the doors to the home was broken and could not be locked. Moreover, these incidents occurred at some unspecified time prior to the first commitment proceeding, long before the separation and divorce. Courtney did not testify that it had happened again since.

¶49. Courtney described Rodney as disagreeable and paranoid. She did allege that he sometimes involved her in his delusions, but she never described him as responding to perceived persecutions with violence. In fact, Courtney never alleged that Rodney hurt her, tried to hurt her, or threatened her – or that he had ever done anything like that to anyone else. The most recent psychological evaluation, following Courtney's second attempt to have Rodney committed, described him as "[n]onthreatening, nonviolent, [and] cordial" and relayed that he had been "observed in ward for one week without incident of violence or threats." Past indications of concern by medical professionals seem to have been largely based on Courtney's misleading allegations rather than examination or observation of Rodney. And at no point did any medical professional ever indicate that Rodney presented a "substantial likelihood of physical harm" to anyone.

¶50. Rodney represented himself at trial, and, although it may be tempting to joke that one

would have to be crazy to do so, so far as the record reveals he appeared to be coherent and rational throughout the litigation. His brief on appeal is not only coherent, it is exceptional for a layman. At all relevant times throughout, Rodney has been able to hold down a high-paying job with the Internal Revenue Service.

¶51. After the second unsuccessful attempt to have Rodney committed, his doctors apparently discontinued whatever medication he had previously been prescribed. Courtney testified that when Rodney was not on the medication he was disagreeable and "impossible" to live with, and that was why she left him.

¶52. That Rodney's actions "caused the marriage to break down" is insufficient to prove habitual cruel and inhuman treatment. Instead, Courtney was required to show conduct that either:

> (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or

> (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Richard v. Richard*, 711 So. 2d 884, 889 (¶22) (Miss. 1998). There is no allegation of unnatural or infamous conduct, nor has that been asserted in Courtney's brief on appeal; so the issue is whether there was proof of conduct by Rodney that "endangered life, limb, or health" or created a reasonable fear of such. Courtney did not prove this.

¶53. Mississippi law specifically allows for divorce when one spouse is suffering from incurable mental illness. But the Legislature, in the exercise of its exclusive authority to make laws, does not allow divorce for just any mental illness; it must be so severe that the

22

"offending" spouse has been institutionalized for three years prior to the commencement of the divorce action. *See* Miss. Code Ann. § 93-5-1 (Rev. 2013). That did not happen in this case, and Courtney's attempt to "end around" the statute by appealing to the stigma of mental illness should fail. "Divorce is a creature of statute[,] . . . not a gift to be bestowed by the chancellor." *Hemsley v. Hemsley*, 639 So. 2d 909, 912 (Miss.1994) (citation omitted). It "is a statutory act and the statutes must be strictly followed as they are in derogation of the common law." *Id.*

¶54. I respectfully dissent.

**GRIFFIS, P.J., BARNES, ISHEE AND WILSON, JJ., JOIN THIS OPINION.**